FILED

1  DAVID P. NEMECEK, JR. (State Bar No. 194402)
   david@qnlawgroup.com
2  YUNJI WILLA QIAN (State Bar No. 271723)
   willa@qnlawgroup.com                          2013 OCT -2 PM 2: 40
3  QIAN & NEMECEK LLP
   600 California Street, Ninth Floor             CLERK U.S. DISTRICT COURT
4  San Francisco, CA 94108                        CENTRAL DIST. OF CALIF.
   Telephone:   (415) 475-2814                         SANTA ANA
5  Facsimile:   (415) 520-2078
   Attorneys for Plaintiff DEAN DELIS, individually and as
6  Trustee of the DEAN DELIS REVOCABLE TRUST OF
   2004
7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                 SOUTHERN DIVISION – SANTA ANA

11

12 DEAN DELIS, individually and as Trustee    Case No.   **SACV 13-01547 AG (RNBx)**
   of the DEAN DELIS REVOCABLE
13 TRUST OF 2004,                             **COMPLAINT FOR VIOLATIONS OF THE
                                              FEDERAL SECURITIES LAWS AND THE
14                                            CALIFORNIA CORPORATIONS CODE,
                 Plaintiffs,                  FRAUD AND BREACH OF FIDUCIARY
15                                            DUTY**

16         v.

17 SIONIX CORP., JAMES CURRIER,              **DEMAND FOR JURY TRIAL**
   DAVID R. WELLS, JAMES
18 ALEXANDER, JOHAN PERSLOW,
   FRANK POWER, ASCENDIANT
19 SECURITIES, LLC and MICHAEL
   COLE,
20
                 Defendants.
21

22              **NATURE OF THE ACTION AND OVERVIEW**

23         1.    Plaintiff Dean Delis brings this action in his individual capacity and as

24 Trustee of the Dean Delis Revocable Trust of 2004 (the "Delis Trust"), and seeks to redress the

25 damages he has suffered as a result of the fraud perpetrated by the Defendants in connection with

26 the purchase of an unregistered $100,000 convertible note that was issued by Defendant Sionix

27 Corp. (the "Convertible Note"). Defendant Sionix Corp. has attempted to escape liability by

28 falsely claiming that Delis converted the unregistered $100,000 convertible note into shares of

1    common stock of Sionix Corp.

2         2.      Sionix Corp., acting in concert with the broker-dealer it retained to solicit

3    investors for the convertible bond offering, Ascendiant Securities, LLC, and Ascendiant's

4    registered representative Michael Cole, made numerous misrepresentations and failed to disclose

5    material facts to Delis in connection with the sale of the Convertible Note.

6         3.      Moreover, the Convertible Note was never registered with the Securities

7    and Exchange Commission or the California Department of Corporations, and was not exempt

8    from registration or qualification at the time it was sold.

9         4.      After Delis discovered the fraud Sionix perpetrated upon him and the Delis

10   Trust and demanded that Sionix compensate the Delis Trust for the damages it suffered, Sionix's

11   President and Chief Financial Officer David Wells repeatedly and disingenuously took the

12   position that Delis had converted the note into shares of common stock of Sionix when he knew

13   that no conversion had occurred because Delis never signed any of the documents he was

14   required to execute on behalf of the Delis Trust in order to convert the note into shares of

15   common stock of Sionix.  Sionix thereafter filed an Amended Form S-1 on February 8, 2013 with

16   the Securities and Exchange Commission in connection with a planned Initial Public Offering that

17   contains materially false and misleading statements.  Specifically, the Amended Form S-1 filed

18   by Sionix falsely states that the Delis Trust owns 7,582,353 shares of the common stock of

19   Sionix.  That statement is false and misleading because neither plaintiff owns any shares of

20   Sionix Corp., as the convertible note at issue was never converted into shares of Sionix Corp.

21                                    **<u>JURISDICTION</u>**

22        5.      Plaintiffs bring this action pursuant to sections 17(a) (15 U.S.C. § 77q(a))

23   and 12(1) of the Securities Act of 1933 (the '33 Act) (15 U.S.C. § 77-l), Section 10(b) of the

24   Securities Exchange Act of 1934 (the '34 Act) (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated

25   thereunder (17 C.F.R. § 240.10b-5), as well as California Corporation Code sections 25401 and

26   25110 and common law claims.

27        6.      The Court has jurisdiction over the Defendants pursuant to Section 22 of

28   the '33 Act (15 U.S.C. § 77v), as well as Section 27 of the '34 Act (15 U.S.C.A. § 78aa), as well

1  as supplemental jurisdiction over Plaintiffs' claims brought pursuant to the California

2  Corporations Code and common law claims.

3  **VENUE**

4        7.    Venue is proper in this district pursuant to the venue clause contained in

5  section 9(d) of the Convertible Note, which provides that "Each party agrees that all legal

6  proceedings concerning the interpretation, enforcement and defense of the transactions

7  contemplated by any of the Transaction Documents (whether brought against a party hereto or its

8  respective Affiliates, directors, officers, shareholders, employees, or agents) shall be commenced

9  in the state and federal courts sitting in the County of Orange."

10  **THE PARTIES**

11        8.    Plaintiff Dean Delis ("Delis") is an individual residing in Redwood City,

12  California.  At all times relevant herein, Delis was the trustee of Plaintiff Dean Delis Revocable

13  Trust of 2004, which was organized under the laws of the state of California.  Delis and the Delis

14  Trust are collectively referred to herein as "Plaintiffs."

15        9.    Defendant Sionix Corp. ("Sionix") is a Nevada corporation with its

16  principal place of business in Los Angeles, California at all times relevant herein (Sionix moved

17  its principal place of business to Houston, Texas after the events described in this complaint

18  occurred).  At all times relevant herein, the Sionix was registered with the United States

19  Securities and Exchange Commission and its stock was publicly traded on the Over-the-Counter

20  Bulletin Board.

21        10.    Defendant James Currier ("Currier") is an individual currently residing in

22  or around Phoenix, Arizona.  At all relevant times alleged herein, Currier was the Chief Executive

23  Officer and the Principal Executive Officer of Sionix, the chairman of its board of directors and

24  resided in or around Los Angeles, California.

25        11.    Defendant David R. Wells ("Wells") is an individual residing in Santa

26  Monica, California.  At all relevant times alleged herein, Wells was the President, Chief Financial

27  Officer, Secretary/Treasurer, and Principal Financial and Accounting Officer of Sionix, and a

28  member of its board of directors.

3

COMPLAINT

1          12.     Defendant James Alexander ("Alexander") is an individual residing in

2    Carson City, Nevada.  At all relevant times alleged herein, Alexander was a member of the board

3    of directors of Sionix.

4          13.     Defendant Johan Perslow ("Perslow") is an individual residing in Seal

5    Beach, California.  At all relevant times alleged herein, Perslow was a member of the board of

6    directors of Sionix.

7          14.     Defendant Frank Power ("Power") is an individual residing in or around

8    Anaheim, California.  At all relevant times alleged herein, Power was a member of the board of

9    directors of Sionix.

10         15.     Defendant Ascendiant Securities, LLC ("Ascendiant") is a Nevada limited

11   liability company with its principal place of business in Irvine, California.  Ascendiant is

12   registered with the United States Securities and Exchange Commission as a broker-dealer and is a

13   member of the Financial Industry Regulatory Authority ("FINRA").  Ascendiant was an agent of

14   Sionix and was acting on behalf of Sionix at all relevant times alleged herein.

15         16.     Defendant Michael Cole ("Cole") is an individual residing in or around

16   Aliso Viejo, California.  At all relevant times alleged herein, Cole was a broker and a registered

17   representative of Ascendiant with FINRA and was acting within the course and scope of his

18   authority as an employee and registered representative of Ascendiant.

19                              **GENERAL ALLEGATIONS**

20         17.     In or around March 2012, Defendant Cole contacted Delis regarding a

21   convertible note offering by Sionix (the "Convertible Note Offering").  Cole represented to Delis

22   that there was substantial demand for the Convertible Note Offering and that the Convertible

23   Note Offering was oversubscribed (in other words, Cole represented that demand from investors

24   for the convertible note offering exceeded the amount of the convertible notes that were being

25   offered for sale by Sionix).

26         18.     In or around March and April 2012, Defendants Cole and Wells

27   represented to Delis that the Delis Trust should purchase the Convertible Note Offering

28   immediately because Sionix had been contacted by an investor who was interested in purchasing

1  the entire Convertible Note Offering, and if that occurred the Delis Trust would be precluded

2  from purchasing any portion of the convertible note offering.

3         19.    During a meeting in early May 2012 and shortly before the transaction at

4  issue closed, Delis commented to Wells that he was impressed that the Convertible Note Offering

5  was oversubscribed and that Sionix would be sufficiently capitalized after the close of the

6  convertible note offering.  Wells said that he was happy that Delis and his co-investor The

7  Dorothy Frances Sanford Living Trust (the "Sanford Trust") had agreed to purchase the

8  convertible note, that he was pleased that the Convertible Note Offering was oversubscribed, and

9  that Sionix would have sufficient capital to fund its day-to-day operations once it received cash

10  from investors who purchased the Convertible Note Offering.  Shortly thereafter and during that

11  same meeting, Wells instructed Delis to sign the paperwork to finalize the purchase of the

12  convertible note by the Delis Trust.

13         20.    Delis signed the paperwork to facilitate the purchase of the Convertible

14  Note in early May 2012.  Shortly thereafter, Sionix issued an "8% Convertible Debenture" to the

15  Trust (the "convertible note") and backdated the Convertible Note so that the date of the issuance

16  of the note was listed as April 30, 2012.  A true and correct copy of the Convertible Note is

17  attached hereto as <u>Exhibit A</u> and is incorporated by reference into the Complaint as through fully

18  set forth herein.

19         21.    After the close of the Convertible Note Offering and after Sionix issued the

20  convertible note to the Delis Trust, Delis discovered that Cole and Wells made numerous

21  misrepresentations to him in connection with the Convertible Note Offering and that Cole,

22  Ascendiant, Wells and Sionix failed to disclose material facts that they had a duty to disclose in

23  connection with the Convertible Note Offering.

24         22.    Delis discovered after the close of the Convertible Note Offering that the

25  offering was never oversubscribed, as was repeatedly misrepresented and fraudulently concealed

26  by Cole and Wells during the course of the Convertible Note Offering.  Delis discovered after the

27  close of the Convertible Note Offering that the Delis Trust and the Sanford Trust were the only

28  purchasers of the Convertible Note Offering, that only $200,000 in notes were purchased by

1   investors for the entire Convertible Note Offering, and that the Convertible Note Offering was

2   vastly undersubscribed.  The lack of interest by investors in the Convertible Note Offering left

3   Sionix grossly undercapitalized and without sufficient cash to fund its operations following the

4   close of the Convertible Note Offering.

5            23.     Sionix has fraudulently attempted to avoid the consequences of its

6   wrongdoing, as well as the wrongdoing of Wells, Cole and Ascendant.  Sionix has knowingly

7   and wrongfully taken the position that the Delis Trust converted the Convertible Note into shares

8   of common stock of Sionix despite the fact Delis has never signed any paperwork necessary to

9   effectuate the conversion of the Convertible Note into shares of common stock of Sionix.

10           24.     On or about February 8, 2013, Sionix filed a Registration Statement with

11   the United States Securities and Exchange Commission on Form S-1 that contains materially false

12   and misleading information.  The registration statement falsely states that the Delis Trust owns

13   7,582,333 shares of the common stock of Sionix that would be offered for sale as part of an

14   upcoming Initial Public Offering of shares of the common stock of Sionix

15           25.     Sionix has since disclosed in a Form 10-Q that it filed with the Securities

16   and Exchange Commission on August 14, 2012 that it entered into an agreement with Ascendant

17   in April 2012 to sell $550,000 in convertible notes.  Sionix acknowledged in that Form 10-Q that

18   Ascendant raised only $200,000 pursuant to the Convertible Note Offering.  If Delis had known

19   had known that Sionix was only planning to raise $550,000 by way of the Convertible Note

20   Offering, he would not have authorized the Delis Trust to purchase the Convertible Note because

21   Sionix would not have been sufficiently capitalized to conduct its operations even if it had

22   actually raised $550,000 by way of the Convertible Note Offering, especially in light of the fact

23   that Sionix reported in filings with the Securities and Exchange Commission that it had only

24   $21,713 in cash on hand at the end of 2011 and just over $1 million in operating expenses during

25   the fourth quarter of 2011.

26                         **FIRST CAUSE OF ACTION**

27        **(Violation of Section 12(1) of the '33 Act – Against Sionix and Ascendant)**

28           26.     Plaintiffs incorporate the allegations of paragraphs 1 through 25 as though

1 | fully set forth herein.

2 |         27.    The Convertible Note Offering and the acts complained of in this

3 | Complaint involve the purchase of a "security" within the meaning of section 2(1) of the '33 Act

4 | (15 U.S.C § 77b(1)).

5 |         28.    In March, April and May 2012, Defendants Cole and Wells met with Delis

6 | and offered the convertible note for purchase to Delis and the Delis Trust both orally and in

7 | writing.

8 |         29.    Defendant Ascendiant sent instructions for the wiring of the $100,000 in

9 | funds for purchase of the convertible note by the Delis Trust to Delis through the use of the mails.

10 |         30.    In March, April and May 2012, Defendants Cole and Wells offered the

11 | security at issue by both telephone calls and in personal meetings with Delis.  The telephone calls

12 | by Cole and Wells originated in Los Angeles, California and Irvine, California and were received

13 | by Delis in San Mateo, California and Redwood City, California.  Such communications were

14 | made by the use and means of interstate commerce of the United States.

15 |         31.    The Convertible Note was not registered with the Securities and Exchange

16 | Commission as required by Section 5 of the '33 Act (15 U.S.C. § 77e) and was therefore offered

17 | and sold by Defendants in violation of Section 12(1) of the '33 Act (15 U.S.C. § 77-l).

18 |         32.    The Delis Trust is entitled to rescind the agreement that was used to

19 | facilitate the purchase and sale of the convertible note and will deliver the Convertible Note to

20 | Sionix upon receipt of the purchase price paid by the Delis Trust, plus interest at 10% per annum

21 | from the date of the purchase of the Convertible Note.

22 |         33.    Plaintiffs have been required to employ the services of the law firm of Qian

23 | & Nemecek LLP to prosecute this action, and are therefore entitled to recover the attorney's fees

24 | and costs they have incurred in prosecuting this action.

25 | **SECOND CAUSE OF ACTION**

26 | **(Violation of Section 10(b) of the '34 Act and Rule 10b-5 Promulgated Thereunder –**

27 | **Against Sionix and Ascendiant)**

28 |         34.    Plaintiffs incorporate the allegations of paragraphs 1 through 33 as though

COMPLAINT

1  fully set forth herein.

2         35.     Defendants Sionix and Ascendiant engaged in a plan, scheme, and

3  unlawful course of conduct pursuant to which they knowingly and recklessly engaged in acts,

4  transactions, practices and courses of business which operated as a fraud on Plaintiffs.

5  Defendants made untrue statements of material fact and omitted to state material facts necessary

6  in order to make the statements made, in light of the circumstances under which they were made,

7  not misleading, which operated as a fraud and deceit on Plaintiffs.

8         36.     The purpose and effect of Defendants' scheme was to artificially inflate the

9  price of the convertible note to induce Plaintiffs to purchase the convertible note from Defendants

10  in order to reap sales commissions and benefits, as well as drive down and drive down the interest

11  rate Sionix offered to pay on the convertible note.

12         37.     Plaintiffs did not know of the falsity of the misstatements, did not know the

13  facts which were omitted, and relied on the untrue statements of fact in purchasing the convertible

14  note.

15         38.     As a result of the untrue statements, omissions, manipulative and

16  fraudulent activities and fraudulent course of conduct by Defendants, Plaintiffs have suffered

17  damages.

18                          **THIRD CAUSE OF ACTION**

19        **(Violation of Section 17 of the '33 Act – Against Sionix and Ascendiant)**

20         39.     Plaintiffs incorporate the allegations of paragraphs 1 through 38 as though

21  fully set forth herein.

22         40.     The misstatements, omissions, fraudulent and manipulative activities, and

23  the fraudulent conduct of Sionix and Ascendiant constitute a violation of Section 17(a) of the '33

24  Act (15 U.S.C.A. § 77q(a)).

25         41.     As a direct and  proximate result of Defendants' violation of Section 17(a)

26  of the '33 Act, Plaintiffs have suffered damages.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOURTH CAUSE OF ACTION**

**(Violation of Section 20(a) of the '34 Act – Against Currier and Wells)**

42.     Plaintiffs incorporate the allegations of paragraphs 1 through 41 as though fully set forth herein.

43.     Currier and Wells acted as controlling persons of Sionix within the meaning of section 20(a) of the '34 Act. By virtue of their positions with Sionix and ownership of Sionix stock, Currier and Wells had the power and authority to use Sionix to engage in the wrongful conduct complained of herein. Sionix controlled Currier and Wells and all of its employees. By reason of such conduct, Currier and Wells are liable pursuant to section 20(a) of the '34 Act.

**FIFTH CAUSE OF ACTION**

**(Violation of California Corporations Code Section 25110 – Against All Defendants)**

44.     Plaintiffs incorporate the allegations of paragraphs 1 through 43 as though fully set forth herein.

45.     The Convertible Note is a "security" within the meaning of California Corporations Code section 25110.

46.     The Convertible Note Offering was offered and sold in an "issuer transaction" within the meaning of California Corporations Code section 25110.

47.     Defendants offered and sold the Convertible Note Offering within the state of California within the meaning of California Corporations Code section 25008 and 25017.

48.     The Convertible Note that was sold to Plaintiffs was never qualified and was not exempt from the requirement of qualification. Sionix therefore violated California Corporations Code section 25110 in the sale of the Convertible Note to Plaintiffs.

49.     Defendants Currier, Wells, Alexander, Perslow, Power, Ascendiant and Cole materially aided Sionix in violating Corporations Code section 25110 and are therefore liable pursuant to Corporations Code section 25504.

50.     Plaintiffs are entitled to rescind the agreement that was used to facilitate the purchase and sale of the Convertible Note and will deliver the Convertible Note to Sionix

9

1  upon receipt of the purchase price paid by Plaintiffs, plus interest at 10% per annum from the date

2  of Plaintiffs' purchase of the Convertible Note.

3       51.    Plaintiffs have been required to employ the services of the law firm of Qian

4  & Nemecek LLP to prosecute this action, and are therefore entitled to recover the attorney's fees

5  and costs they have incurred in prosecuting this action.

6  **SIXTH CAUSE OF ACTION**

7  **(Violation of California Corporations Code Section 25401 – Against All Defendants)**

8       52.    Plaintiffs incorporate the allegations of paragraphs 1 through 51 as though

9  fully set forth herein.

10       53.    In offering and selling the Convertible Note to Plaintiffs, Defendants made

11  untrue statements of material fact and omitted to state material facts to Plaintiffs.

12       54.    The misstatements and omissions referred to herein were "material facts"

13  within the meaning of California Corporations Code section 25401 because they were facts that a

14  reasonable investor would consider in deciding whether to invest.

15       55.    Defendants' offer and sale of the Convertible Note were by means of

16  misrepresentations and omissions within the meaning of California Corporations Code section

17  25401.

18       56.    Defendants' misrepresentations and omissions of material fact took place

19  "within the state" of California within the meaning of Corporations Code section 25008.

20       57.    Defendants Currier, Wells, Alexander, Perslow, Power, Ascendiant and

21  Cole materially aided Sionix in violating Corporations Code section 25401 and are therefore

22  liable pursuant to Corporations Code section 25504.

23       58.    As a direct and proximate result of Defendants' violations of Corporations

24  Code section 25401, Plaintiffs have suffered damages.

25  **SEVENTH CAUSE OF ACTION**

26  **(Fraud – Against Sionix, Ascendiant, Cole and Wells)**

27       59.    Plaintiffs incorporate the allegations of paragraphs 1 through 58 as though

28  fully set forth herein.

10

60. During the course of the Convertible Note Offering, Cole and Wells made misrepresentations of fact to Plaintiffs. At the time Cole made misrepresentations of fact to Plaintiffs, Cole was acting within the course and scope of his employment as a registered representative of Ascendiant, and Ascendiant was acting as an agent of Sionix.

61. Specifically, Cole represented to Plaintiffs that there was substantial demand for the Convertible Note Offering and that the Convertible Note Offering was oversubscribed. Wells reaffirmed the misrepresentations made by Cole to Plaintiffs, and further represented to Plaintiffs that Sionix would have sufficient capital to fund its day-to-day operations once it received the funds from investors who invested in the Convertible Note Offering.

62. Cole and Wells knew the statements referenced in the paragraph immediately above were false when they made them. Specifically, Cole and Wells knew that the Convertible Note Offering was not oversubscribed at the time they represented to Plaintiffs that the Convertible Note Offering was oversubscribed. Wells knew that Sionix would still be grossly undercapitalized without sufficient capital to fund its day-to-day operations after the close of the Convertible Note Offering.

63. In making the misrepresentations described in paragraph 61 above, Cole and Wells intended that Plaintiffs rely upon them in order to induce Plaintiffs to purchase the Convertible Note.

64. Plaintiffs reasonably relied upon the misrepresentations made by Cole and Wells in making their investment decision to purchase the Convertible Note.

65. As a direct, substantial, and foreseeable result of the misrepresentations made by Cole and Wells, Plaintiffs have been damaged in an amount that exceeds $100,000.

66. Defendants conduct in committing the acts described herein was fraudulent, malicious and oppressive, and warrants an award of punitive damages.

## **EIGHTH CAUSE OF ACTION**

### **(Fraudulent Concealment – Against Sionix, Wells, Ascendiant and Cole)**

67. Plaintiffs incorporate the allegations of paragraphs 1 through 66 as though fully set forth herein.

11

68.     Defendants Sionix, Wells, Ascendant and Cole fraudulently concealed the fact that the Convertible Note Offering was undersubscribed from Plaintiffs and that Sionix would not have sufficient capital to fund its day-to-day operations after the close of the Convertible Note Offering as a result.

69.     Defendants had a duty to disclose to Plaintiffs during the course of the Convertible Note Offering and before Plaintiffs purchased the Convertible Note the fact that the Convertible Note Offering was undersubscribed and not oversubscribed, as well as the fact that Sionix would not have sufficient capital to fund its day-to-day operations after the close of the Convertible Note Offering.

70.     Defendants had the opportunity before the close of the Convertible Note Offering to disclose the fact that the Convertible Note Offering was undersubscribed to Plaintiffs and that Sionix would not have sufficient capital to fund its day-to-day operations after the close of the Convertible Note Offering, yet they failed to do so.

71.     Plaintiffs did not discover that the Convertible Note Offering was undersubscribed and not oversubscribed, and that Sionix would not have sufficient capital to fund its day-to-day operations after the close of the Convertible Note Offering until after the close of the Convertible Note Offering.

72.     As a direct, substantial, and foreseeable result of the fraudulent concealment of material facts by Defendants, Plaintiffs have been damaged in an amount that exceeds $100,000.

73.     Defendants' conduct in committing the acts described herein was fraudulent, malicious and oppressive, and warrants an award of punitive damages.

## NINTH CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against Ascendant and Cole)

74.     Plaintiffs incorporate the allegations of paragraphs 1 through 73 as though fully set forth herein.

75.     By virtue of their relationship with Plaintiffs as broker and client, Ascendant and Cole set out to create and did in fact create a special relationship of trust and

12

confidence, and thereby owed Plaintiffs a fiduciary duty.  A fiduciary relationship existed between Ascendant and Cole on the one hand, and Plaintiffs on the other hand at all relevant times described herein.

76.     Ascendant and Cole breached the fiduciary duty they owed to Plaintiffs by making the misrepresentations described herein for purposes of generating commissions from the Convertible Note Offering in violation of their ethical and professional obligations.

77.     As a direct, substantial, and foreseeable result of the breach of fiduciary duty owed to Plaintiffs by Ascendant and Cole, Plaintiffs have been damaged in an amount that exceeds $100,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     For judgment requiring Sionix to rescind the Convertible Note Offering and return the principal paid by Plaintiffs in purchasing the Convertible Note, together with accrued interest at the legal rate of 10% from April 30, 2012 to the date of judgment.

2.     For general damages sustained as a direct, proximate and foreseeable result of the wrongful conduct of Defendants in an amount according to proof that shall exceed $100,000.

3.     For an award of punitive damages for Defendants' malicious, oppressive and outrageous conduct in an amount according to proof that shall exceed $200,000.

4.     For attorney's fees and costs of suit incurred herein; and

5.     For such other and further relief as the court may deem proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

COMPLAINT

1   Dated:  October 1, 2013

2

3                              QIAN & NEMECEK LLP

4                      By:_____

5                          DAVID P. NEMECEK, JR.
YUNJI WILLA QIAN
Attorneys for Plaintiffs DEAN DELIS,
individually and as Trustee of the DEAN DELIS
REVOCABLE TRUST

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT A

**EXHIBIT A**

NEITHER THIS SECURITY NOR THE SECURITIES INTO WHICH THIS SECURITY IS CONVERTIBLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.

Original Issue Date: **April 30, 2012**

$100,000

## SIONIX CORPORATION
## 8% CONVERTIBLE DEBENTURE

THIS DEBENTURE is one of a series of duly authorized and validly issued 8% Convertible Debentures of Sionix Corporation, a Nevada corporation, (the "Company"), having its principal place of business at 914 Westwood Blvd., Box 801, Los Angeles, CA 90024, designated as its 8% Convertible Debenture (this debenture, the "Debenture" and, collectively with the other debentures of such series, the "Debentures").

FOR VALUE RECEIVED, the Company promises to pay to the order of **Dean Delis Revocable Trust (Dated 1.16.2004)** or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of **$100,000 on October 30, 2013** (the "Maturity Date") or such earlier date as this Debenture is required or permitted to be repaid as provided hereunder, and to pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Debenture in accordance with the provisions hereof. This Debenture is subject to the following additional provisions:

Section 1.     Definitions.  For the purposes hereof, in addition to the terms defined elsewhere in this Debenture, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Alternate Consideration" shall have the meaning set forth in Section 5(e).

"Bankruptcy Event" means any of the following events: (a) the Company or any Significant Subsidiary (as such term is defined in Rule 1-02(w) of Regulation S-X), excluding any subsidiaries or interest in subsidiaries created or entered into by the Company for the purposes of financing its systems, thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief

1

of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary thereof; (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement; (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment; (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors; (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (g) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Base Conversion Price" shall have the meaning set forth in Section 5(b).

"Business Day" means any day except any Saturday, any Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Buy-In" shall have the meaning set forth in Section 4(e)(v).

"California Courts" shall have the meaning set forth in Section 9(d).

"Change of Control Transaction" means the occurrence after the date hereof of any of (i) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 51% of the voting securities of the Company (other than by means of conversion or exercise of the Debentures and the Securities issued together with the Debentures), or (ii) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, or (iii) the Company sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, or, or (iv) the execution by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (i) through (iii) above.

"Conversion Date" shall have the meaning set forth in Section 4(a).

2

"Conversion Price" shall have the meaning set forth in Section 4(c).

"Conversion Shares" means, collectively, the shares of Common Stock issued or issuable upon conversion of this Debenture in accordance with the terms hereof, including without limitation shares of Common Stock issued or issuable as interest or in payment of principal hereunder or as damages under the Transaction Documents.

"Debenture Register" shall have the meaning set forth in Section 2(c).

"Effectiveness Period" shall have the meaning set forth in the Registration Rights Agreement.

"Event of Default" shall have the meaning set forth in Section 8.

"Fundamental Transaction" shall have the meaning set forth in Section 5(e).

"Initial Conversion Price" shall have the meaning set forth in Section 4(c).

"Late Fees" shall have the meaning set forth in Section 2(d).

"Mandatory Default Amount" means the sum of (i) the greater of (A) 130% of the outstanding principal amount of this Debenture, plus 100% of accrued and unpaid interest hereon, or (B) the outstanding principal amount of this Debenture, plus all accrued and unpaid interest hereon, divided by the Conversion Price on the date the Mandatory Default Amount is either (a) demanded (if demand or notice is required to create an Event of Default) or otherwise due or (b) paid in full, whichever has a lower Conversion Price, multiplied by the VWAP on the date the Mandatory Default Amount is either (x) demanded or otherwise due or (y) paid in full, whichever has a higher VWAP, and (ii) all other amounts, costs, expenses and liquidated damages due in respect of this Debenture.

"Market Price" shall equal the closing sale price per share of the Common Stock on the principal market on which the Common Stock is traded on the Trading Day on which such price is being determined.

"Notice of Conversion" shall have the meaning set forth in Section 4(a).

"Original Issue Date" means the date of the first issuance of the Debentures, regardless of any transfers of any Debenture and regardless of the number of instruments which may be issued to evidence such Debentures.

"Permitted Indebtedness" means (a) the indebtedness evidenced by the Debentures, (b) the Indebtedness existing on the Original Issue Date and set forth on Schedule 3.1(aa) attached to the Purchase Agreement, provided that the terms of any such Indebtedness have not been changed from the terms existing on the Closing Date, (c) lease obligations and purchase money indebtedness of up to $1,000,000, per event, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets and (d) indebtedness that (i) is expressly

3

subordinate to the Debentures pursuant to a written subordination agreement with the Purchasers that is acceptable to each Purchaser in its sole and absolute discretion and (ii) matures at a date later than the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP; (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien; (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b) and (c) thereunder, provided that such Liens are not secured by assets of the Company or its Subsidiaries other than the assets so acquired or leased; and (d) Liens described in Schedule (aa) to the Purchase Agreement.

"Purchase Agreement" means the Securities Purchase Agreement pursuant to which this Debenture was issued, dated on or about the date hereof, among the Company and the original purchasers of Debentures.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the date of the Purchase Agreement, among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Registration Statement" means a registration statement under the Securities Act for the purpose of registering the resale of all Conversion Shares and Warrant Shares of the Holder, naming the Holder as a "selling stockholder" therein, and meeting the requirements of the Registration Rights Agreement.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Share Delivery Date" shall have the meaning set forth in Section 4(e).

"Subsidiary" shall have the meaning set forth in the Purchase Agreement.

"Trading Day" means a day on which the principal Trading Market is open for business.

"Trading Market" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the American Stock

4

Exchange, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange or the OTC Bulletin Board.

"Transaction Documents" shall have the meaning set forth in the Purchase Agreement.

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted for trading as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)); (b) if the OTC Bulletin Board is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the OTC Bulletin Board; (c) if the Common Stock is not then quoted for trading on the OTC Bulletin Board and if prices for the Common Stock are then reported only on the OTCQB tier maintained by OTC Markets Group, Inc., or on the "Pink Sheets" published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holder and reasonably acceptable to the Company.

Section 2.        Interest; Late Fees.

a)        Interest Rate.  Interest shall accrue daily on the outstanding principal amount of this Debenture at a rate per annum equal to 8%.

b)        Payment of Interest.  On the Maturity Date, the Company shall pay to the Holder any accrued but unpaid interest hereunder on the aggregate unconverted and then outstanding principal amount of this Debenture, and on each Conversion Date the Company shall pay to the Holder any accrued but unpaid interest hereunder on that portion of the principal amount then being converted, which amount may be added to and included in the principal amount being so converted on such date by the Holder. Notwithstanding the foregoing, and notwithstanding any conversion, repayment, prepayment, or other reduction in the outstanding principal amount hereof, the Holder shall be entitled to and shall receive a minimum of twelve (12) months interest hereunder, calculated on the original principal balance hereof.

c)        Interest Calculations. Interest shall be calculated on the basis of a 365-day year and actual days elapsed and shall accrue daily commencing on the Original Issue Date until payment in full of the outstanding principal, together with all accrued and unpaid interest, liquidated damages and other amounts which may become due hereunder, has been made.  Interest hereunder will be paid to the Person in whose name this Debenture is registered on the records of the Company regarding registration and transfers of this Debenture (the "Debenture Register").

d)      Late Fees.  If the Company fails to pay any accrued and unpaid interest payable hereunder within three (3) Trading Days following notice of late payment from the Holder (which may be given orally, by email or any other manner), then such overdue amount shall entail a late fee at an interest rate equal to the lesser of 14% per annum or the maximum rate permitted by applicable law ("Late Fees") which shall accrue daily from the date such interest was originally due hereunder through and including the date of actual payment in full.

Section 3.      Registration of Transfers and Exchanges.

a)      Different Denominations. This Debenture is exchangeable for an equal aggregate principal amount of Debentures of different authorized denominations, as requested by the Holder surrendering the same.  No service charge will be payable for such registration of exchange.

b)      Investment Representations. This Debenture has been issued subject to certain investment representations of the original Holder set forth in the Purchase Agreement and may be transferred or exchanged only in compliance with the Purchase Agreement and applicable federal and state securities laws and regulations.

c)      Reliance on Debenture Register. Prior to due presentment for transfer to the Company of this Debenture, the Company and any agent of the Company may treat the Person in whose name this Debenture is duly registered on the Debenture Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Debenture is overdue, and neither the Company nor any such agent shall be affected by notice to the contrary.

Section 4.      Conversion.

a)      Voluntary Conversion. At any time after the Original Issue Date, until this Debenture is no longer outstanding, this Debenture shall be convertible, in whole or in part, into shares of Common Stock at the option of the Holder, at any time and from time to time (subject to the conversion limitations set forth in Section 4(d) hereof).  The Holder shall effect conversions by delivering to the Company a Notice of Conversion, the form of which is attached hereto as Annex A (a "Notice of Conversion"), specifying therein the principal amount of this Debenture to be converted and the date on which such conversion shall be effected (such date, the "Conversion Date").  If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion is deemed delivered hereunder.  To effect conversions hereunder, the Holder shall not be required to physically surrender this Debenture to the Company unless the entire principal amount of this Debenture, plus all accrued and unpaid interest thereon, has been so converted. Conversions hereunder shall have the effect of lowering the outstanding principal amount of this Debenture in an amount equal to the applicable conversion.  The Holder and the Company shall maintain records showing the principal amount(s) converted and the date of such conversion(s).  The

6

Company may deliver an objection to any Notice of Conversion within one (1) Business Day of delivery of such Notice of Conversion. In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder, and any assignee by acceptance of this Debenture, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Debenture, the unpaid and unconverted principal amount of this Debenture may be less than the amount stated on the face hereof.

b)      Forced Conversion Option. If at any time prior to the Maturity Date, the Company's Common Stock has, for any twenty (20) consecutive trading-day period (i) a closing bid price of $0.40 per share or greater as reported by Bloomberg, and (ii) daily trading volume of Three Hundred Thousand (300,000) shares or greater as reported by Bloomberg (any such event, a "Forced Conversion Triggering Event"), the Company shall have the right (but not the obligation) to demand that the Holder convert some or all of this Debenture. The Company shall deliver notice of a Forced Conversion Triggering Event to the Company by completing and delivering a Notice of Conversion to the Company. The definitions, deadlines and procedures set forth herein following delivery of a Notice of Conversion shall apply.

c)      Conversion Price. The "Conversion Price" shall equal (a) if the Conversion Date is during the first forty five (45) days following the Original Issue Date, then $0.08 (the "Initial Conversion Price"), and from the Original Issue Date until September 28, 2012 no more than $0.13, otherwise it will be 75% of the average of the three (3) lowest closing bid prices for the Common Stock on the Trading Market during the ten (10) consecutive Trading Days immediately preceding the applicable Conversion Date on which the Holder elects to convert all or part of this Debenture, which Conversion Price (including without limitation the Fixed Price) shall be subject to adjustment as provided in this Debenture.

d)      Conversion Limitation – Holder's Restriction on Conversion. The Company shall not effect any conversion of this Debenture, and the Holder shall not have the right to convert any portion of this Debenture, to the extent that after giving effect to the conversion set forth on the applicable Notice of Conversion, the Holder (together with the Holder's Affiliates, and any other person or entity acting as a group together with the Holder or any of the Holder's Affiliates) would beneficially own in excess of the Beneficial Ownership Limitation (as defined below). For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its Affiliates shall include the number of shares of Common Stock issuable upon conversion of this Debenture with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which are issuable upon (A) conversion of the remaining, unconverted principal amount of this Debenture beneficially owned by the Holder or any of its Affiliates and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company subject to a limitation on conversion or exercise analogous to the limitation contained herein (including, without limitation, any other Debentures or the Warrants) beneficially owned by the Holder or any of its Affiliates. Except as set forth in the preceding sentence, for

7

purposes of this Section 4(d), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. To the extent that the limitation contained in this paragraph applies, the determination of whether this Debenture is convertible (in relation to other securities owned by the Holder together with any Affiliates) and of which principal amount of this Debenture is convertible shall be in the sole discretion of the Holder, and the submission of a Notice of Conversion shall be deemed to be the Holder's determination of whether this Debenture may be converted (in relation to other securities owned by the Holder together with any Affiliates) and which principal amount of this Debenture is convertible, in each case subject to the Beneficial Ownership Limitation. To ensure compliance with this restriction, the Holder will be deemed to represent to the Company each time it delivers a Notice of Conversion that such Notice of Conversion has not violated the restrictions set forth in this paragraph and the Company shall have no obligation to verify or confirm the accuracy of such determination. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this paragraph, in determining the number of outstanding shares of Common Stock, the Holder may rely on the number of outstanding shares of Common Stock as stated in the most recent of the following: (A) the Company's most recent periodic or annual report, as the case may be; (B) a more recent public announcement by the Company; or (C) a more recent notice by the Company or the Company's transfer agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Holder, the Company shall within two Trading Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Debenture, by the Holder or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The "Beneficial Ownership Limitation" shall be 9.9% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon conversion of this Debenture held by the Holder. By written notice to the Company, the Holder may at any time and from time to time increase or decrease the Beneficial Ownership Limitation to any other percentage specified in such notice (or specify that the Beneficial Ownership Limitation shall no longer be applicable), provided, however, that (A) any such increase (or inapplicability) shall not be effective until the sixty-first (61st) day after such notice is delivered to the Company, and (B) any such increase or decrease shall apply only to the Holder and not to any other holder of Debentures. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this paragraph to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor holder of this Debenture.

8

    e)      <u>Mechanics of Conversion</u>.

        i.      <u>Omitted</u>.

        ii.      <u>Delivery of Certificate Upon Conversion</u>. Not later than three Trading Days after each Conversion Date (the "<u>Share Delivery Date</u>"), the Company shall deliver, or cause to be delivered, to the Holder a certificate or certificates representing the Conversion Shares which, on or after the Effective Date, shall be free of restrictive legends and trading restrictions (other than those which may then be required by the Purchase Agreement) representing the number of Conversion Shares being acquired upon the conversion of this Debenture required to be delivered by the Company under this Section 4 electronically through the Depository Trust Company or another established clearing corporation performing similar functions.

        iii.      <u>Failure to Deliver Certificates</u>.  If in the case of any Notice of Conversion such certificate or certificates are not delivered to or as directed by the applicable Holder by the third Trading Day after the Conversion Date, the Holder shall be entitled to elect by written notice to the Company at any time on or before its receipt of such certificate or certificates, to rescind such Conversion, in which event the Company shall promptly return to the Holder any original Debenture delivered to the Company and the Holder shall promptly return to the Company the Common Stock certificates representing the principal amount of this Debenture unsuccessfully tendered for conversion to the Company.

        iv.      <u>Obligation Absolute; Partial Liquidated Damages</u>. The Company's obligations to issue and deliver the Conversion Shares upon conversion of this Debenture in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any Person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder or any other Person of any obligation to the Company or any violation or alleged violation of law by the Holder or any other Person, and irrespective of any other circumstance which might otherwise limit such obligation of the Company to the Holder in connection with the issuance of such Conversion Shares; <u>provided</u>, <u>however</u>, that such delivery shall not operate as a waiver by the Company of any such action the Company may have against the Holder.  In the event the Holder of this Debenture shall elect to convert any or all of the outstanding principal amount hereof, the Company may not refuse conversion based on any claim that the Holder or anyone associated or affiliated with the Holder has been engaged in any violation of law, agreement or for any other reason, unless an injunction from a court, on notice to Holder, restraining and or enjoining conversion of all or part of this Debenture shall have been sought and obtained, and the Company posts a surety bond for the benefit of the Holder in the amount of 150% of the outstanding principal amount of this Debenture,

9

which is subject to the injunction, which bond shall remain in effect until the completion of arbitration/litigation of the underlying dispute and the proceeds of which shall be payable to the Holder to the extent it obtains judgment.  In the absence of such injunction, the Company shall issue Conversion Shares or, if applicable, cash, upon a properly noticed conversion.  If the Company fails for any reason to deliver to the Holder such certificate or certificates pursuant to Section 4(e)(ii) by the second Trading Day after the Share Delivery Date, the Company shall pay to the Holder, in cash, as liquidated damages and not as a penalty, for each $1000 of principal amount being converted, $10 per Trading Day (increasing to $20 per Trading Day on the fifth Trading Day after such liquidated damages begin to accrue) for each Trading Day after such second Trading Day after the Share Delivery Date until such certificates are delivered.  Nothing herein shall limit a Holder's right to pursue actual damages or declare an Event of Default pursuant to Section 8 hereof for the Company's failure to deliver Conversion Shares within the period specified herein and the Holder shall have the right to pursue all remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.  The exercise of any such rights shall not prohibit the Holder from seeking to enforce damages pursuant to any other Section hereof or under applicable law.

v.      <u>Compensation for Buy-In on Failure to Timely Deliver Certificates Upon Conversion</u>. In addition to any other rights available to the Holder, if the Company fails for any reason to deliver to the Holder such certificate or certificates by the Share Delivery Date pursuant to Section 4(e)(ii), and if after such Share Delivery Date the Holder is required by its brokerage firm to purchase (in an open market transaction or otherwise), or the Holder's brokerage firm otherwise purchases, shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Conversion Shares which the Holder was entitled to receive upon the conversion relating to such Share Delivery Date (a "<u>Buy-In</u>"), then the Company shall (A) pay in cash to the Holder (in addition to any other remedies available to or elected by the Holder) the amount by which (x) the Holder's total purchase price (including any brokerage commissions) for the Common Stock so purchased exceeds (y) the product of (1) the aggregate number of shares of Common Stock that the Holder was entitled to receive from the conversion at issue multiplied by (2) the actual sale price at which the sell order giving rise to such purchase obligation was executed (including any brokerage commissions) and (B) at the option of the Holder, either reissue (if surrendered) this Debenture in a principal amount equal to the principal amount of the attempted conversion or deliver to the Holder the number of shares of Common Stock that would have been issued if the Company had timely complied with its delivery requirements under Section 4(e)(ii).  For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of this Debenture with respect to which the actual sale price of the Conversion Shares (including any brokerage commissions) giving rise to such purchase obligation was a total of $10,000 under clause (A) of the immediately preceding sentence, the Company shall be required to pay the Holder

$1,000.  The Holder shall provide the Company written notice indicating the amounts payable to the Holder in respect of the Buy-In and, upon request of the Company, evidence of the amount of such loss.  Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock upon conversion of this Debenture as required pursuant to the terms hereof.

vi.      <u>Reservation of Shares Issuable Upon Conversion</u>. The Company covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock for the sole purpose of issuance upon conversion of this Debenture and payment of interest on this Debenture, each as herein provided, free from preemptive rights or any other actual contingent purchase rights of Persons other than the Holder (and the other holders of the Debentures), not less than such aggregate number of shares of the Common Stock as shall (subject to the terms and conditions set forth in the Purchase Agreement) be issuable (taking into account the adjustments of Section 5) upon the conversion of the outstanding principal amount of this Debenture and payment of interest hereunder.  The Company covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly authorized, validly issued, fully paid and nonassessable and, if the Registration Statement is then effective under the Securities Act, shall be registered for public sale in accordance with such Registration Statement.

vii.     <u>Fractional Shares</u>. No fractional shares or scrip representing fractional shares shall be issued upon the conversion of this Debenture.  As to any fraction of a share which Holder would otherwise be entitled to purchase upon such conversion, the Company shall at its election, either pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Conversion Price or round up to the next whole share.

viii.    <u>Transfer Taxes</u>.  The issuance of certificates for shares of the Common Stock on conversion of this Debenture shall be made without charge to the Holder hereof for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificates, provided that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder of this Debenture and the Company shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

11

Section 5.      Certain Adjustments.

a)      Stock Dividends and Stock Splits.  If the Company, at any time while this Debenture is outstanding: (A) pays a stock dividend or otherwise makes a distribution or distributions payable in shares of Common Stock on shares of Common Stock or any Common Stock Equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon conversion of, or payment of interest on, the Debentures); (B) subdivides outstanding shares of Common Stock into a larger number of shares; (C) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares; or (D) issues, in the event of a reclassification of shares of the Common Stock, any shares of capital stock of the Company, then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.  Any adjustment made pursuant to this Section shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b)      Pro Rata Distributions. If the Company, at any time while this Debenture is outstanding, distributes to all holders of Common Stock (and not to the Holders) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security (other than the Common Stock, which shall be subject to Section 5(b)), then in each such case the Conversion Price shall be adjusted by multiplying such Conversion Price in effect immediately prior to the record date fixed for determination of stockholders entitled to receive such distribution by a fraction of which the denominator shall be the VWAP determined as of the record date mentioned above, and of which the numerator shall be such VWAP on such record date less the then fair market value at such record date of the portion of such assets or evidence of indebtedness so distributed applicable to one (1) outstanding share of the Common Stock as determined by the Board of Directors of the Company in good faith. In either case the adjustments shall be described in a statement delivered to the Holder describing the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one (1) share of Common Stock.  Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

c)      Fundamental Transaction. If, at any time while this Debenture is outstanding, (A) the Company effects any merger or consolidation of the Company with or into another Person, (B) the Company effects any sale of all or substantially all of its assets in one transaction or a series of related transactions, (C) any tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (D) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock

12

is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), then, upon any subsequent conversion of this Debenture, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 5(e) and insuring that this Debenture (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

d)      Calculations.  All calculations under this Section 5 shall be made to four decimal places or the nearest 1/100th of a share, as the case may be.  For purposes of this Section 5, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding any treasury shares of the Company) issued and outstanding.  For purposes of this Section 5, the term Conversion Price shall include without limitation the Fixed Price such that such figures shall be adjusted accordingly upon any adjustment to the Conversion Price hereunder.

e)      Notice to the Holder.

i.      Adjustment to Conversion Price.  Whenever the Conversion Price is adjusted pursuant to any provision of this Section 5, the Company shall promptly deliver to each Holder a notice setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment.

ii.      Notice to Allow Conversion by Holder.  If (A) the Company shall declare a dividend (or any other distribution in whatever form) on the Common Stock, (B) the Company shall declare a special nonrecurring cash dividend on or a

13

redemption of the Common Stock, (C) the Company shall authorize the granting to all holders of the Common Stock of rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company is a party, any sale or transfer of all or substantially all of the assets of the Company, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property or (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company, then, in each case, the Company shall cause to be filed at each office or agency maintained for the purpose of conversion of this Debenture, and shall cause to be delivered to the Holder at its last address as it shall appear upon the Debenture Register, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice.  The Holder is entitled to convert this Debenture during the 20-day period commencing on the date of such notice through the effective date of the event triggering such notice.

Section 6.       No Prepayment/Redemption.  The Company may not prepay or redeem this Debenture in whole or in part without the prior written consent of the Holder, and to the extent the Company agrees with any other holder of Debentures to prepay or redeem such holder's Debentures in whole or in part, the Company shall offer such prepayment or redemption of this Debenture on a pro rata basis on the same terms and conditions as agreed upon for such other Debentures.

Section 7.       Negative Covenants. As long as any portion of this Debenture remains outstanding, unless the Holder has otherwise given prior written consent, the Company shall not, and shall not permit any of its subsidiaries (whether or not a Subsidiary on the Original Issue Date) to, directly or indirectly:

a)        amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

b)      repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to (a) the Conversion Shares or Warrant Shares as permitted or required under the Transaction Documents and (b) repurchases of Common Stock or Common Stock Equivalents of departing employees of the Company, provided that such repurchases shall not exceed an aggregate of $100,000 for all officers and directors during the term of this Debenture;

c)      pay cash dividends or distributions on any equity securities of the Company;

d)      enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval); or

e)      enter into any agreement with respect to any of the foregoing.

Section 8.      Events of Default.

a)      "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

i.      any default in the payment of (A) the principal amount of any Debenture or (B) interest, liquidated damages and other amounts owing to a Holder on any Debenture, as and when the same shall become due and payable (whether on a Conversion Date or the Maturity Date or by acceleration or otherwise) which default, solely in the case of an interest payment or other default under clause (B) above, is not cured within 3 Trading Days;

ii.      the Company shall fail to observe or perform any other covenant or agreement contained in the Debentures (other than a breach by the Company of its obligations to deliver shares of Common Stock to the Holder upon conversion, which breach is addressed in clause (xi) below) which failure is not cured, if possible to cure, within the earlier to occur of (A) 5 Trading Days after notice of such failure sent by the Holder or by any other Holder and (B) 10 Trading Days after the Company has become or should have become aware of such failure;

iii.      a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

iv.      any representation or warranty made in this Debenture, any other Transaction Documents, or any written statement pursuant hereto or thereto or any certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

v.      the Company or any Significant Subsidiary shall be subject to a Bankruptcy Event;

vi.      the Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable, except as currently exists;

vii.      if at any time the Common Stock shall not be eligible for listing or quotation for trading on a Trading Market and shall not be eligible to resume listing or quotation for trading thereon within five (5) Trading Days;

viii.      the Company shall be a party to any Change of Control Transaction or Fundamental Transaction or shall agree to sell or dispose of all or in excess of 55% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction);

ix.      if, during the Effectiveness Period (as defined in the Registration Rights Agreement), either (a) the effectiveness of the Registration Statement lapses for any reason or (b) the Holder shall not be permitted to resell Registrable Securities (as defined in the Registration Rights Agreement) under the Registration Statement for a period of more than 20 consecutive Trading Days or 40 non-consecutive Trading Days during any 12 month period; provided, however, that if the Company is negotiating a merger, consolidation, acquisition or sale of all or substantially all of its assets or a similar transaction and, in the written opinion of counsel to the Company, the Registration Statement would be required to be amended to include information concerning such pending transaction(s) or the parties thereto which information is not available or may not be publicly disclosed at the time, the Company shall be permitted an additional 15 consecutive Trading Days during any 12 month period pursuant to this Section 8(a)(x);

x.      any monetary judgment, writ or similar final judicial or arbitration process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of 45 calendar days.

16

b)      Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Debenture, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount.  After the occurrence of any Event of Default, the interest rate on this Debenture shall accrue at an interest rate equal to the lesser of 14% per annum or the maximum rate permitted under applicable law.  Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Debenture to or as directed by the Company.  In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law.  Such acceleration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Debenture until such time, if any, as the Holder receives full payment pursuant to this Section 8(b).  No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

Section 9.      Miscellaneous.

a)      Notices.  Any and all notices or other communications or deliveries to be provided by the Holder hereunder, including, without limitation, any Notice of Conversion, shall be in writing and delivered personally, by facsimile, by email, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address or mailing address as the Company may specify for such purpose by notice to the Holder delivered in accordance with this Section 9.  Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by facsimile, by email or sent by a nationally recognized overnight courier service addressed to each Holder at the facsimile number or address of the Holder appearing on the books of the Company, or if no such facsimile number or address appears, at the principal place of business of the Holder.  Except as may otherwise be provided herein, any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile or by email prior to 5:30 p.m. (New York City time) on a Trading Day,  with electronic confirmation of such delivery, (ii) the first Trading Day immediately following the date of transmission, if such notice or communication is delivered via facsimile or by email not on a Trading Day or between 5:30 p.m. (New York City time) and  11:59 p.m. (New York City time) on any date,  with electronic confirmation of such delivery, (iii) the second Business Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (iv) upon actual receipt by the party to whom such notice is required to be given.  The address, facsimile and email address for such notices and communications shall be as set forth on the signature pages attached to the Purchase Agreement.

b)      Absolute Obligation. Except as expressly provided herein, no provision of this Debenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, liquidated damages and accrued interest, as applicable, on this Debenture at the time, place, and rate, and in the coin or currency, herein prescribed.  This Debenture is a direct debt obligation of the Company.  This Debenture ranks pari passu with all other Debentures now or hereafter issued under the terms set forth herein.

c)      Lost or Mutilated Debenture.  If this Debenture shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Debenture, or in lieu of or in substitution for a lost, stolen or destroyed Debenture, a new Debenture for the principal amount of this Debenture so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Debenture, and of the ownership hereof, reasonably satisfactory to the Company.

d)      Governing Law.  All questions concerning the construction, validity, enforcement and interpretation of this Debenture shall be governed by and construed and enforced in accordance with the internal laws of the State of California, without regard to the principles of conflict of laws thereof.  Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the County of Orange (the "California Courts").  Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the California Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such California Courts, or such California Courts are improper or inconvenient venue for such proceeding.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Debenture and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Debenture or the transactions contemplated hereby. If either party shall commence an action or proceeding to enforce any provisions of this Debenture, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorney's fees and other costs and expenses reasonably incurred in the investigation, preparation and prosecution of such action or proceeding.

18

e)      Waiver.  Any waiver by the Company or the Holder of a breach of any provision of this Debenture shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Debenture. The failure of the Company or the Holder to insist upon strict adherence to any term of this Debenture on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Debenture.  Any waiver by the Company or the Holder must be in writing.

f)      Severability.  If any provision of this Debenture is invalid, illegal or unenforceable, the balance of this Debenture shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Debenture as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this indenture, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impeded the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g)      Next Business Day.  Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

h)      Headings.  The headings contained herein are for convenience only, do not constitute a part of this Debenture and shall not be deemed to limit or affect any of the provisions hereof.

i)      Assumption.  Any successor to the Company or any surviving entity in a Fundamental Transaction shall (i) assume, prior to such Fundamental Transaction, all of the obligations of the Company under this Debenture and the other Transaction Documents pursuant to written agreements in form and substance satisfactory to the Holder (such approval not to be unreasonably withheld or delayed) and (ii) issue to the Holder a new debenture of such successor entity evidenced by a written instrument substantially similar in form and substance to this Debenture, including, without limitation, having a principal amount and interest rate equal to the principal amount and the interest rate of this Debenture and having similar ranking to this Debenture, which shall be satisfactory to the Holder (any such approval not to be unreasonably withheld or delayed).  The provisions of this Section 9(i) shall apply similarly and equally to

19

successive Fundamental Transactions and shall be applied without regard to any limitations of this Debenture.

   j)  <u>Usury</u>. This Debenture shall be subject to the anti-usury limitations contained in the Purchase Agreement.

*********************

20

IN WITNESS WHEREOF, the Company has caused this Debenture to be duly executed by a duly authorized officer as of the date first above indicated.

**SIONIX CORPORATION**

By: _____
    Name: James R. Currier
    Title:  Chairman and CEO

21

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| Dean Delis, individually and as Trustee of the Dean Delis Revocable Trust of 2004 | Sionix Corp., James Currier, David R. Wells, James Alexander, Johan Perslow, Frank Power, Ascendiant Securities, LLC and Michael Cole |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |
|---|---|
| David P. Nemecek, Jr. (SBN 194402); Qian & Nemecek LLP<br>600 California Street, Ninth Floor<br>San Francisco, CA 94108<br>david@qnlawgroup.com; tel:415-475-2814; fax: 415-520-2078 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding  ☐ 2. Removed from State Court  ☐ 3. Remanded from Appellate Court  ☐ 4. Reinstated or Reopened  ☐ 5. Transferred from Another District (Specify)  ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No  ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§ 77-l, 77q(a), 78j(b) and 17 C.F.R. § 240.10b-5; Complaint for violations of the Federal Securities Laws, California Corporations Code and pendant common law claims

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: **SACV 13-01547 AG (RNBx)**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No<br><br>If "no, " go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?**<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☐ Yes ☒ No<br><br>If "no, " go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

| C.1. Is either of the following true? If so, check the one that applies: | C.2. Is either of the following true? If so, check the one that applies: |
|---|---|
| ☒ 2 or more answers in Column C | ☐ 2 or more answers in Column D |
| ☐ only 1 answer in Column C and no answers in Column D | ☐ only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the<br>**SOUTHERN DIVISION.**<br>Enter "Southern" in response to Question D, below.<br><br>If none applies, answer question C2 to the right. ➡ | Your case will initially be assigned to the<br>**EASTERN DIVISION.**<br>Enter "Eastern" in response to Question D, below.<br><br>If none applies, go to the box below. ⬇ |

Your case will initially be assigned to the
**WESTERN DIVISION.**
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Southern Division |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☐ NO  ☒ YES

If yes, list case number(s): SACV13-01032 AG (JPRx) (removed from Orange County Superior Court; Motion to Remand is pending)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _____  DATE: October 1, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Andrew J. Guilford _____ and the assigned Magistrate Judge is _____ Robert N. Block _____ .

The case number on all documents filed with the Court should read as follows:

### SACV 13-01547 AG (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ October 2, 2013 _____
Date

By _A. Gonzalez_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| ☐ Western Division | ☒ Southern Division | ☐ Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

CV-18 (08/13)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES